# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Heidi Jones,                                             Civil No. 10-510 (SRN/JJK)

               Plaintiff,

      v.                                         <u>MEMORANDUM OPINION</u>
                                                         <u>AND ORDER</u>

David Clark and
S. Baker,

               Defendants.
_____

Duane A. Kennedy, Kennedy Law Office, 724 First Avenue Southwest, Suite 3, Rochester, Minnesota 55902, and William L. French, French Law Firm, 400 South Broadway Avenue, Suite 103, Rochester, Minnesota 55904, for Plaintiff

John M. Baker and Samuel J. Clark, Greene Espel PLLP, 200 South Sixth Street, Suite 1200, Minneapolis, Minnesota 55402, for Defendants
_____

SUSAN RICHARD NELSON, United States District Judge

      This matter is before the Court on Defendants' Motion for Judgment as a Matter of Law.

For the reasons set forth herein, Defendants' Motion is granted.

## I.    BACKGROUND

      On January 23-24, 2012, a jury trial was held before the undersigned judge in this matter.

In her Complaint, Plaintiff Heidi Jones alleged civil rights violations under 42 U.S.C. § 1983 and

a battery claim against Defendants David Clark and S. Baker, Olmsted County Sheriff's

Deputies.  (Compl. [Doc. No. 1].)   Jones, Clark and Baker testified at trial.  At the conclusion of

Plaintiff's case, Defendants moved for judgment as a matter of law.

      Plaintiff's claims arose from events occurring in the early morning hours of February 15,

2009.   Plaintiff testified that on the preceding evening of February 14, 2009, she had been

angry at her husband for not taking her out to dinner on Valentine's Day. (Trial Transcript at 46.) That evening, she left their apartment in Rochester, Minnesota, and walked to a nearby bar. At trial, Jones verified her deposition testimony, in which she stated that, at the bar, she had a strong drink containing several shots of alcohol, near the bar's closing time. (Id. at 47.) Jones conceded that the drink "really affected [her]," given that she was taking a high dose of Oxycontin as well as an anti-depressant, for which alcohol was contraindicated. (Id. at 43-44; 47; 51.) Jones conceded that at some point while she was in the bar, she was intoxicated. (Id. at 48.) In her testimony, Jones also acknowledged that, in her experience, the use of painkillers coupled with a state of intoxication, is harmful to her memory. (Id. at 39-40.) Between 2:00 and 2:30 a.m., Jones recalls leaving the bar in the company of two couples whom she had just met at the bar. She traveled with them to a house inhabited by one or more of them in the nearby town of Byron, Minnesota. (Id. at 48.)

At some point after their arrival in Byron, a dispute arose between the parties and one of the persons in the house phoned the police. Plaintiff, who was wearing a sweatshirt, jeans, baseball cap, but no coat, left the house. (Id. at 49-50.) She testified that she did not want to phone anyone for a ride in the middle of the night, but acknowledged that she had no car and no money for a taxi. (Id. at 50-51.)

Olmsted County Deputy Sheriff R.D. Johnson, who was dispatched to the Byron residence, wrote a report describing his response to the call from the Byron residence. A redacted version of his report was admitted in evidence at trial and reflects that the call concerned a complaint of a disorderly person (Redacted Johnson Supp'l Report, Defs' Ex. 3.) In his report, Deputy Johnson indicated that he encountered Plaintiff stumbling down the middle

of the road in the vicinity of the house from which the call had come.  She appeared to be very intoxicated and slurred her words.   In his report, Deputy Johnson described Jones as passive aggressive, noting that she yelled at him as she spoke, refused to cooperate and told him to "get the fuck away from me."  (Id. at 1.)  He identified her by the contents of her purse as Heidi Jones.  (Id.)  Jones reported that she had been inappropriately touched by someone in the Byron residence.  Deputy Johnson summoned another officer to transport Plaintiff to the Crisis Receiving Unit ("CRU"), or detox unit, in Rochester, Minnesota, while he returned to the Byron residence to investigate Plaintiff's allegations of assault.

Deputy Clark responded to Deputy Johnson's call for assistance.  Clark also wrote a report regarding his interaction with Plaintiff on February 15, 2009, and testified at trial.  A redacted version of his supplemental report was admitted in evidence.  (Redacted Clark Supp'l Report, Defs' Ex. 4.)  Deputy Clark testified that Deputy Johnson had placed Plaintiff in the back of Clark's squad car without handcuffs.  (Trial Transcript at 98-99.)  Deputy Clark testified that at no time was Plaintiff under arrest.[1]  (Id. at 99.)  According to his report, Deputy Clark found Jones to be "obviously severely intoxicated," a conclusion he based on her bloodshot, watery eyes, running make-up, "overwhelming odor of alcohol on her breath and on her person," slurred speech and threatening behavior toward the occupants at the Byron residence.  (Redacted Clark Supp'l Report at 1, Defs' Ex. 4.)  During the transport to the CRU, Clark reported that Jones was "belligerent, crying, begging and even offer[ing] sexual favors if [Clark] would release her."  (Id.)  When the transport began, Clark activated a video recording device, which

---

[1]  Deputy Clark ultimately issued Plaintiff a disorderly conduct citation.  (Trial Transcript at 99.)

recorded Jones' interaction with Deputy Clark during the drive to the CRU in Rochester.[2]

A DVD of that video was admitted in evidence at trial and was played to the jury.  (DVD of Transport, Defs' Ex. 1.)  The video shows Jones begging not to be taken to detox, pleading with Deputy Clark, often hysterically, sobbing and speaking in a loud tone of voice, with slurred speech.  The video shows Jones noting that it was Valentine's Day, and that earlier in the evening,  her husband screamed at her and hit her in front of the kids.  (Id. at 03:55:59.)   She later repeats that her husband punched her on Valentine's Day.  (Id. at 03:58:13.)  In court, however, Jones testified that her husband did not hit her in front of the children on Valentines Day - "[n]ot that day."  (Trial Transcript at 86.)  Near the end of the ride, in her desperation to avoid being taken to the CRU, Jones tells Clark that she will do whatever he wants, even perform sexual favors, in order to avoid being taken to detox.  (DVD of Transport at 04:07:39, Defs' Ex. 1.)   In response to her offer to perform sexual favors, Deputy Clark responds, "Jesus, just be quiet." (Id.  at 04:07:43; Clark Redacted Supp'l Report at 2, Defs' Ex. 4.)

During the ride, Jones also states that she has had her driver's license revoked and voices her concern that an admission to the CRU will harm her chances of getting her license reinstated. (DVD of Transport at 03:52:54, Defs' Ex. 1.)  Deputy Clark's responses to Jones are short, measured and neutral.  At trial, Deputy Clark testified that he purposely allowed for short periods of silence in his responses to Jones, so that she understood that he was not questioning her and would perhaps calm down.  (Trial Transcript at 143.)  On the video, when Jones accuses

---

[2]  Deputy Clark testified that while he did not place Plaintiff under arrest, in some of his documentation, he coded the event as an "arrest."   He explained that pursuant to the Olmsted County Sheriff's Office's policy regarding retention of video recordings, doing so would permanently save the video recording from routine deletion.  (Trial Transcript at 100; 112-13.)

Clark of not helping her, he states that he is helping her by taking her somewhere safe. (DVD of Transport at 04:06:03.) Because Deputy Clark refuses to take her home, Jones accuses him of "ruining her life." (Id. at 04:07:43.) Near the conclusion of the ride, Jones threatens to commit suicide, stating, "I'm gonna kill myself after this. I'm just gonna kill myself." (Id. at 4:08:33.)

Testifying at trial about Jones' general demeanor during the transport, Deputy Clark testified," I would best describe it as up and down. There were brief moments of calm, followed by almost sheer panic and desperation. And it just kind of rode a roller coaster all the way up and down, as we saw in the video." Deputy Clark also testified that based on Plaintiff's agitated behavior during the transport, he requested a second squad car at the CRU to assist in escorting Plaintiff inside. (Trial Transcript at 137.) Clark testified that he was concerned about Jones attempting to flee because she did not wish to go to detox, was not dressed appropriately for the weather, was not thinking rationally and thus was not equipped to care for herself. (Id. at 130-31.) Clark also testified that he was concerned that because Plaintiff was not handcuffed, flight might be a possibility, or due to her state of agitation, she might attempt to fight. (Id. at 138.) In Jones' trial testimony, she acknowledged that she was desperate to avoid admission to the CRU. She also acknowledged that she threatened to kill herself and agreed that she was angry at Deputy Clark during the ride to the CRU. (Id. at 12; 57.) Deputy Clark testified that Jones posed a threat to herself, both because her impairment would render her unable to safely navigate streets on foot, and because she expressly stated that she wanted to kill herself. (Id. at 131-32.)

In addition, Deputy Clark testified that he found Plaintiff's behavior threatening to him as well. Clark testified that at one point during the transport, Jones stated something to the effect of, "I swear to God, when I get out . . ." followed by some unintelligible comment. (DVD of

Transport at 04:01:33, Defs' Ex. 1.)   Clark testified that, based on his experience in law enforcement, he construed Jones' comment as an implied threat.  In addition, he testified that he viewed her offer to perform sexual favors as threatening to his career, his credibility and his oath as a law enforcement officer.  (Trial Transcript at 135-36.)

When Deputy Clark and Plaintiff arrived at the CRU in Rochester, Olmsted County Deputy Scott Baker was present, having responded to Deputy Clark's request for assistance. (Clark Redacted Supp'l Report at 1, Defs' Ex. 4.)  Deputy Baker wrote a report regarding the event in question, which was admitted in evidence at trial (Baker Supp'l Report, Defs' Ex. 5). Deputy Baker also testified at trial.  In his report, Deputy Baker noted that after Deputy Clark and Jones arrived in the squad car, he spoke with Clark, who informed him that Jones was not handcuffed, was combative and uncooperative.  (Baker Supp'l Report at 1 Defs' Ex. 5.)  Deputy Clark testified that he told Baker that they might have a problem getting Plaintiff from the car into the CRU and that they needed to handcuff her.  (Trial Transcript at 139; see also Clark Redacted Supp'l Report at 2, Defs' Ex. 4.)  Officer Clark testified that regardless of whether Jones was compliant with the officers, he believed that she needed to be handcuffed for her own safety and for the deputies' safety.  (Trial Transcript at 141.)  He explained that this was the case because Jones was impaired, had threatened to commit suicide and because the deputies were armed with weapons, which Plaintiff might try to reach, given her impaired state.  (Id.)  Deputy Clark testified that he wanted to diffuse any possible anger that Jones might have towards him, therefore, as he had been trained, he asked Deputy Baker to open the door of the squad car to initiate verbal contact with Jones.  (Id. at 139-40.)

While they were speaking, Jones remained in the back of the squad car.  Baker testified,

and his report and Deputy Clark's report reflect, that at this time, Jones began screaming in the squad car and kicked at the window of the car.   (Id. at 191; Baker Supp'l Report at 1, Defs' Ex. 5; Clark Redacted Supp'l Report at 2, Defs' Ex. 4.)  Jones testified that she did not recall doing so.  (Trial Transcript at 59.)  In his report, Baker noted that he instructed Jones to stop, opened the rear door of the squad car and asked her to step out.  (Baker Supp'l Report at 1, Defs' Ex. 5.) Jones refused to comply and continued to yell and cry, saying, "Don't touch me."  (Clark Redacted Supp'l Report at 2, Defs' Ex. 4; Baker Supp'l Report at 1, Defs' Ex. 5.)

In his report, Deputy Clark noted that he told Jones that he wanted to handcuff her. (Clark Redacted Supp'l Report at 2, Defs' Ex. 4.)  Jones, however, testified that she had no understanding that the officers wanted to handcuff her.  (Trial Transcript at 69-70.)  Deputy Baker reported that he asked Jones to step out of the squad car again and that she refused to comply.  Instead, she lay in a fetal position in the back of the squad car with her knees up to her chest and her hands clenched in front of her.  (Baker Supp'l Report at 1, Defs' Ex. 5) In her testimony, Jones agreed that she did not intend to let the deputies pull her out of the backseat of the squad car.  (Trial Transcript at 64.)

Deputy Clark reported that Deputy Baker then ordered Jones to exit the squad car.  (Clark Redacted Supp'l Report at 2, Defs' Ex. 4.)  He testified that this was the next level of "force," in the Sheriff Department's continuum of force, beginning with officer presence (in this case, the presence of Deputy Baker), increasing to an officer's request (to step out of the car), and an officer's command (to step out of the car.)  (Trial Transcript at 142-43.)  Deputy Baker reported that he reached in to take hold of Jones' wrists and Jones screamed and kicked at Deputy Baker, with her foot making contact with his thigh.  (Baker Supp'l Report at 1, Defs' Ex. 5.)  Jones

7

agreed that she stuck her foot out of the car, but testified that she did not intend to kick Deputy

Baker.  (Trial Transcript at 68.)  In his report, Deputy Clark noted that Deputy Baker then

backed away a short distance while Jones partially got out of the car, which Deputy Clark

interpreted as a possible precursor to flight. (Clark Redacted Supp'l Report at 3, Defs' Ex. 4.)

Baker reported that he continued to reach in and eventually grabbed hold of Plaintiff's left wrist,

pulling her from the vehicle.  (Baker Supp'l Report at 1, Defs' Ex. 5.)  Deputy Clark reported that

after Baker pulled Jones from the squad car, she "was posturing" in a way that appeared she

might attempt to assault them.  (Clark Redacted Supp'l Report at 3, Defs' Ex. 4.)  Deputy Baker

reported that after pulling her from the car, Jones tightened her muscles in such a way as to make

it difficult for Baker to place her hands together for handcuffing, and screamed that he was

assaulting her.  Baker continued to order Jones to calm down and place her hands behind her

back and she refused to comply.  (Baker Supp'l Report at 1, Defs' Ex. 5.)   Deputy Clark

reported that he warned Jones that if her behavior continued, he would be forced to use his taser

on her.  (Clark Redacted Supp'l Report at 3, Defs' Ex. 4.)

In his report, Deputy Baker noted that Deputy Clark drew his taser and ordered Jones to

place her hands behind her back, or risk being tased.  (Baker Supp'l Report at 1, Defs' Ex. 5.)

Deputy Clark also reported that he drew his taser, removed the dart cartridge and warned Jones

that he was going to use the taser.  (Clark Redacted Supp'l Report at 3, Defs' Ex. 4.)  Baker

reported that at the same time, Plaintiff continued to struggle with him.  (Baker Supp'l Report at

1, Defs' Ex. 5.)  Both deputies reported that Deputy Clark then performed a "drive-stun" on

Plaintiff's upper right thigh.[3]  (Id.; Clark Redacted Supp'l Report at 3.)  Plaintiff testified,

---

[3] As this Court observed in Imp v. Wallace, when a taser is used in drive-stun mode, as
opposed to "dart mode," an officer presses electrical nodes against the subject's body, without

however, that the taser was deployed in the chest or shoulder area.  (Trial Transcript at 70.)

Deputy Clark reported that Jones was flailing her legs and, consequently, he believed while the

taser was in operation, it slid up and down her leg.  (Clark Redacted Supp'l Report at 3, Defs'

Ex. 4.)   At trial, Deputy Clark testified that because Jones was moving while he deployed the

taser, Jones' body was not in direct contact with the taser for the full five seconds.  (Trial

Transcript at 94.)  Plaintiff screamed and fell back into the squad car.  (Baker Supp'l Report at 1,

Defs' Ex. 5; Clark Redacted Supp'l Report at 3.)  Plaintiff testified that the effect of the taser

knocked her back into the car.  (Trial Transcript at 14; 71.)   Deputy Baker reported that he again

reached in and tried to gain control of Jones' hands, but she continued to struggle and kick at

him, although her feet did not make actual contact with him this time.  (Baker Supp'l Report at 1,

Defs' Ex. 5.)  Plaintiff testified that she could not quickly move her hand in position to be

handcuffed after the taser was deployed.  (Trial Transcript at 72.)

     Deputy Clark then administered a second drive-stun of the taser on Plaintiff's right thigh.

(Baker Supp'l Report at 1, Defs' Ex. 5.)   Deputy Clark testified that the taser itself produces a

record of the instances of deployment.  (Trial Transcript at 164-65.)  In this case, the record was

introduced as a trial exhibit.  (Taser Deployment Record, Defs' Ex. 6.)  The deployment record

reflects that the taser was deployed for two five-second periods, eighteen seconds apart, on

-------------------

deployment of darts. In dart mode, a taser fires metal darts that penetrate the skin and cause
neuro-muscular interruption. 10-CV-509 (DSD/JJK), 2011 WL 4396941 at *5, n.10 (D. Minn.
Sept. 21, 2011) (citing McKenney v. Harrison, 635 F.3d 354, 364 (8th Cir. 2011) (Murphy, J.,
concurring)).  Here, there is no dispute between the parties that Deputy Clark deployed the taser
in drive-stun mode.  Deputy Clark testified that when a taser is used in drive-stun mode,
electricity is pushed into the subject's body, cycling for a five-second period before
automatically switching off.  (Trial Transcript at 94.)

February 15, 2009.[4] (Id. at 22.)

After the second application of the taser, Deputy Baker reported that Plaintiff then was compliant and the two deputies were able to help Jones stand up. (Trial Transcript at 194-95.) Plaintiff testified that the second tasing rendered her unconscious and she had no memory of events after the taser was used for the second time until some point during which she was escorted to the CRU, when she saw the ground passing below her. (Id. at 74.) Deputy Clark testified that Jones was not unconscious, but that she stood on her own feet after the second deployment of the taser and, with the deputies' assistance, was escorted to the back of the squad car. (Id. at 173.) Deputy Baker reported that he and Deputy Clark then walked Jones to the back of the squad car and positioned her face-forward on the trunk in order to handcuff her. (Baker Supp'l Report at 1, Defs' Ex. 5.) Deputy Baker testified that when he and Deputy Clark helped Jones stand up from the trunk, she went limp, fell out of Deputy Baker's grasp, and fell slowly to the ground. (Trial Transcript at 197-98.)

Deputy Baker reported that after he and Deputy Clark laid Jones across the trunk of the squad car, he was able to gain control of Plaintiff's left wrist, which was behind her back. (Baker Supp'l Report at 1, Defs' Ex. 5.) However, he reported that her right arm was extended on the trunk, with her face on her arm. Deputy Baker instructed Deputy Clark to control Jones' head in order to avoid the possibility of being bitten as he reached for Jones' right wrist. (Baker Supp'l Report at 1, Defs' Ex. 5.) Deputy Baker was then able to handcuff Jones. (Id.)

---

[4] The deployment record also includes a third entry for February 15, 1009, showing a one-second deployment, approximately twelve hours after the other two deployments on that date. (Taser Deployment Record at 22, Defs' Ex. 6.) Deputy Clark explained that this third deployment was likely a test fire that he or another officer conducted at the beginning of his next shift. (Trial Transcript at 167.)

According to the deputies' reports, after she was handcuffed, Jones refused to walk under her own power, so Deputy Baker and a CRU staff member who was present placed their hands under Jones' underarms and carried her to the entrance to the CRU.  (Baker Supp'l Report at 1, Defs' Ex. 5; Clark Redacted Supp'l Report at 3, Defs' Ex. 4.)  Deputy Clark testified that he purposely stood aside in order to diffuse the situation with Jones.  (Trial Transcript at 176.)  Because Jones is approximately six feet tall, Deputy Baker noted that her feet, and possibly her legs, were dragging on the pavement when she was carried a distance of approximately 40 feet.  (Baker Supp'l Report at 1, Defs' Ex. 5.)  He testified that he did not believe Jones' knees dragged on the ground.  (Trial Transcript at 218-219.)   Likewise, Deputy Clark noted that due to Jones' tall height, a portion of her lower body appeared to drag  along the ground as she was carried into the CRU, but he did not believe that her knees dragged on the pavement.  (Clark Redacted Supp'l Report at 3-4, Defs' Ex. 4.)   Jones, however, testified that when she regained consciousness during her escort into the CRU, her knees were dragging on the ground.  (Trial Transcript at 17.)

Once inside the CRU, Jones was then secured in a seclusion room.  (Baker Supp'l Report at 1, Defs' Ex. 5.)  In his report, Deputy Clark noticed that Jones had what appeared to be scars from self-inflicted wounds on her wrists, and that he observed her making a "mooing" sound and slapping herself on the face and head as he walked past her seclusion room.  (Clark Redacted Supp'l Report at 3, Defs', Ex. 4.)

Deputy Clark reported that he returned to the CRU later that evening and requested that a female staff member from the CRU take photographs of Jones' legs.  (Clark Redacted Supp'l

Report at 3, Defs' Ex. 4.)  A total of eight photographs were taken.[5]  (Id.)  Deputy Clark noted

that he reviewed the photographs and observed what appeared to be older bruises on Jones' legs,

small red round marks consistent with the use of the taser, fresh abrasions on the knees and one

wrist and blackened eyes.  (Id. at 4.)   Jones testified that her wrists were badly bruised and cut,

her knees were scratched, bruised and swollen, her eyes were black and blue, and she had several

two-pronged burn marks on her leg.  (Trial Transcript at 18-19.)

       Jones acknowledged in her testimony that she had no permanent injuries as a result of

actions she attributed to Defendants.  (Id. at 76.)  She also testified that she did not seek

psychological or medical attention for the injuries she attributed to Defendants, nor  lost wages.

(Id. at 76-78.)  As to photos depicting marks on Plaintiff's palm and wrist, Jones testified that

she did not know whether those marks were caused by her own actions or those of Defendants

because she was unconscious when she was handcuffed.  (Id. at 83.)  She also testified that none

of the photographs depict taser marks on her chest and shoulder, which she explained was

because the taser did not go through her sweatshirt.  (Id.)  As to the marks on her face, or

blackened eyes, Plaintiff testified that they were not there before she went to detox, but admitted

that she did not know how to otherwise account for them.  (Id. at 84-85.)  Jones acknowledged

that neither Clark nor Baker hit her.  (Id. at 85.)

       Plaintiff testified that she did not think the use of force was necessary.  However, she did

not claim that the deputies should have pulled her wrists together with brute force as an

alternative means of getting her handcuffed and out of the squad car.  (Id. at 84.)   She described

_____

      [5]  Several of these photographs were admitted in evidence at trial (e.g., Pl's Exs. 2, 4, 6
and Defs' Ex. 14), along with photographs taken by Plaintiff and/or her husband approximately
two weeks later. (Pl's Exs. 5, 7 and 8.)

the sensation of being tased as similar to "grabbing an electric fence, but not letting go," and

testified that it was painful.  (Id. at 15; 71.)

The Olmsted County Sheriff's Department's use of force policy was admitted in evidence

at trial.  (Olmsted County Sheriff's Office Use of Force Policy ["Policy"], Pl's Ex. 1.)  Under the

policy, deputies are required to "[e]mploy the minimum force reasonably necessary to

accomplish a legal purpose," and deputies "may resort to more severe methods of force to

overcome either increasing resistance or an increasingly dangerous threat to public safety."  (Id.

at 2.)  Deputy Clark testified that under the Olmsted County Sheriff's Department use of force

policy, the lowest possible use of force is first applied before applying the next level of force.

(Trial Transcript at 142; see also Policy at 2, Pl's Ex. 1.)  Also, Deputy Clark stated that reaching

into a squad car to try to grab a person's hands puts both that person and the officer at a greater

risk for injury, due to the proximity of officers' weapons and the possibility of a non-handcuffed

person's access to the weapons.  (Id. at 147.)  Deputy Clark testified that physically

overpowering Jones would involve a higher level of force than necessary and a higher level of

force than tasing.  (Id. at 159-60.)

Under the use of force policy, the use of chemical agents or sprays are considered to be at

the same level of force as the use of "stun technology and EMD devices," such as a taser.

(Olmsted County Sheriff's Office Use of Force Policy, Pl's Ex. 1 at 5-6.)   The policy provides:

"[c]ertain situations may require the use of stun technology devices.  When chemical agents

would be ineffective or inappropriate, physical contact would lead to deputy-initiated jeopardy,

and other force measures are not authorized, stun tools and EMD devices bridge the gap."  (Id.)

Deputy Baker testified that, in his opinion, he would not have considered the use of chemical

spray due, explaining, "it would have been far more aggravating to the person being sprayed,

plus, the overspray would have sprayed me, and Deputy Clark also probably would have got

some in his eyes, which would have affected us also."  (Trial Transcript at 220-21.)

## II.   DISCUSSION

Rule 50 of the Federal Rules of Civil Procedure provides:

If a party has been fully heard on an issue during a jury trial and the court finds
that a reasonable jury would not have a legally sufficient evidentiary basis to find
for the party on that issue, the court may:

(A) resolve the issue against the party; and

(B) grant a motion for judgment as a matter of law against the party on a
claim or defense that, under the controlling law, can be maintained or
defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1).  In analyzing a motion for judgment as a matter of law, the court must:

(1) resolve direct factual conflicts in favor of the nonmovant; (2) assume as true all facts

supporting the nonmovant which the evidence tends to prove; (3) give the nonmovant the benefit

of all reasonable inferences; and (4) deny the motion if the evidence so viewed would allow

reasonable jurors to differ as to the conclusions that could be drawn.  Roberson v. AFC

Enterprises, Inc., 602 F.3d 931, 933 (8th Cir. 2010) (noting that appellate court's standard of

review on a ruling for judgment as a matter of law is the same standard used by the district

court).

### A.   Federal Civil Rights Claim

Plaintiff contends that Defendants' use of excessive force and unreasonable seizure

violated her rights to due process and the right to be free from excessive force and seizure.

(Compl. ¶ 19 [Doc. No. 1].)  Defendants argue that they are entitled to judgment as a matter of

law on grounds of qualified immunity.

14

"Qualified immunity shields a government official from liability and the burdens of litigation in a § 1983 action for damages unless the official's conduct violated a clearly established constitutional or statutory right of which a reasonable officer would have known." Chambers v. Pennycook, 641 F.3d 898, 904 (8th Cir. 2011) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).   Qualified immunity is "an immunity from suit rather than a mere defense to liability." Pearson v. Callahan, 555 U.S. 223, 237 (2009) (citing Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).  The Supreme Court has stated that qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" Ashcroft v. al-Kidd, __ U.S. __ , 131 S. Ct. 2074, 2085 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555 U.S. at 231.

### 1.      Excessive Force Claim

To overcome a claim of qualified immunity, a plaintiff alleging excessive use of force, as here, must present sufficient facts to show that the officer's conduct violated a constitutional right and that the constitutional right was clearly established.  Chambers, 641 F.3d at 904. Courts have generally conducted a two-part inquiry, assessing whether the facts show that the challenged conduct violated a constitutional right, and if a violation can be established based on those facts, determining whether the constitutional right at issue was clearly established on the date in question.  See, e.g., Avalos v. City of Glenwood, 382 F.3d 792, 798 (8th Cir. 2004) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).  When undertaking this inquiry, courts may exercise their discretion in determining which of the two prongs should be addressed first, and

whether, in some circumstances, the first prong may be skipped.   Pearson, 555 U.S. at 235-36 (explaining that it may be better to address the second Saucier prong of whether a right is clearly established without first addressing whether there was a constitutional violation where "the constitutional question is so fact-bound that the decision provides little guidance for future cases"); McClennon v. Kipke, __ F. Supp.2d __, 10-CV-2598 (RHK/JJK), 2011 WL 5177393, *3 (D. Minn. Oct. 31, 2011) (citing Pearson, noting that "the Court may skip Saucier's first step and proceed directly to whether the constitutional right at issue was clearly established when the alleged violation occurred").

### a.        Whether the Right Was Clearly Established

In this case, the Court turns first to the second prong of the inquiry – whether the constitutional right at issue was clearly established.  In determining whether the constitutional right was clearly established at the time of the conduct, the Court must ask whether the contours of the applicable law were "'sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" al-Kidd, __ U.S. at  __, 131 S. Ct. at 2083 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  While "[w]e do not require a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." Id. (emphasis added).   To determine whether the right in question is clearly established, courts must identify controlling authority, or a "robust 'consensus of persuasive authority' that defines the contours of the right in question with a high degree of particularity." See Morgan v. Swanson, 659 F.3d 359, 371-72 (5th Cir. 2011) (citing al-Kidd, 131 S. Ct. at 2084 (internal citations omitted).

 It is clearly established law that a law enforcement officer violates the Fourth Amendment right to be free from unreasonable seizure when using excessive force to apprehend

or detain a person.  Imp v. Wallace, 10-CV-509 (DSD/JJK), 2011 WL 4396941, *3 (D. Minn. Sept. 21, 2011) (citing Graham v. Connor, 490 U.S. 386, 395 (1989); Cook v. City of Bella Villa, 582 F.3d 840, 849 (8th Cir. 2009)).  It is also well-established, however, that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396.  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396-97 (citing Terry v. Ohio, 392 U.S. 1, 20-22 (1968)).

However, what was not well-established,"beyond debate," as of February 15, 2009, was whether an excessive force claim required some minimum level of injury.  Chambers, 641 F.3d at 904 (observing that "over the course of more than fifteen years, . . . it . . . remain[ed] an open question in this circuit whether an excessive force claim requires some minimum level of injury.")  In McClennon, this Court addressed a plaintiff's excessive force claims, also involving the use of a taser, arising in 2006. __ F. Supp.2d at ___, 2011 WL 5177393 at * 3-4.  In that case, this Court observed that prior to the Eighth Circuit's 2011 decision in Chambers, different Eighth Circuit panels had reached different conclusions as to whether an excessive force claim required some minimum level of injury.  Id. at *3 (comparing Lambert v. City of Dumas, 187 F.3d 931, 936 (8th Cir. 1999) and Dawkins v. Graham, 50 F.3d 532, 535 (8th Cir. 1995), with Andrews v. Fuoss, 417 F.3d 813, 818 (8th Cir. 2005) and Crumley v. City of St. Paul, Minn., 324 F.3d 1003, 1007 (8th Cir. 2003)).

Chambers, decided in 2011, ended the uncertainty, holding that the excessive-force inquiry must focus on the force applied and not on the level of injury.  In Chambers, the plaintiff brought a § 1983 claim against three police officers alleging that they used excessive force

against him following his arrest.  641 F.3d at 902-03.  Specifically, Chambers testified at his

deposition that in August 2005, one officer kicked him several times while he was restrained,

offering no resistence, that another officer repeatedly choked and kicked him during a trip to the

hospital, and that a third officer took a roundabout route to the hospital and purposely drove

erratically so as to jerk the plaintiff back and forth.  Id.   A doctor evaluating Chambers at the

hospital found that Chambers had upper back pain, diagnosed a back contusion and advised him

to take Tylenol and Ultram pain medication.  The doctor noted that there was no evidence of

fractures of the spine or ribs, nor did Chambers show acute distress.  Id. at 902-03.  While the

court found that Chambers had presented sufficient evidence, if believed, to establish a violation

of the Fourth Amendment, it nonetheless affirmed the district court's ruling that the officers

were entitled to qualified immunity based on the state of the law at the time of the conduct at

issue:

> Given the state of the law in August 2005, a reasonable officer could have
> believed that as long as he did not cause more than *de minimis* injury to an
> arrestee, his actions would not run afoul of the Fourth Amendment. A reasonable
> officer was permitted to assume that legal conclusion when determining how to
> proceed, and he is entitled to have his conduct judged according to that standard
> for purposes of qualified immunity.  See Dunn v. Denk, 79 F.3d 401, 403 (5th
> Cir.1996) (en banc); Harper v. Harris Cnty., 21 F.3d 597, 601 (5th Cir.1994) (per
> curiam).

> According to the testimony given by Chambers, the officers used a degree of
> force that was excessive. Under the law in August 2005, the officers ran the risk
> of liability if that force caused significant injury. But the converse is also true.
> The officers knew there was some chance that their actions would cause only *de
> minimis* injury, and it was reasonable for the officers to believe that they
> remained within constitutional bounds if that was the result. As it turned out, the
> force did not cause more than *de minimis* injury. We reject in this decision a
> constitutional rule that turns on the arrestee's degree of injury, but given the law
> prevailing at the time of the incident, we conclude that the officers are entitled to
> qualified immunity.

Id. at 908-09.

As this Court observed in <u>McClennon</u>, "a reasonable officer making an arrest before <u>Chambers</u> 'could have believed that as long as he did not cause more than *de minimis* injury to an arrestee, his actions would not run afoul of the Fourth Amendment.'" __F. Supp.2d at __, 2011 WL 5177393 at \*4.  "In other words, it was not clearly established pre-<u>Chambers</u> that an officer violated an arrestee's rights, no matter how much force he applied, if he caused only *de minimis* injuries." <u>Id.</u>

Here, Jones testified that her wrists were badly bruised and cut, her knees were scratched, bruised and swollen, her eyes were black and blue, and she had several two-pronged burn marks on her leg.  (Trial Transcript at 18-19.)   However, Jones also acknowledged that she had no permanent injuries as a result of Defendants' actions.  (<u>Id.</u> at 76.)  She testified that she did not seek psychological or medical attention for the injuries she attributes to Defendants, nor lost wages.  (<u>Id.</u> at 76-78.)  Moreover, as to photos depicting marks on Plaintiff's palm and wrist, Jones testified that she did not know whether those marks were caused by her own actions or those of Defendants because she was unconscious when she was handcuffed.  (<u>Id.</u> at 83.)  She also testified that none of the photographs depicted taser marks on her chest and shoulder, which she explained was because the taser did not go through her sweatshirt.  (<u>Id.</u>)  As to the marks on her face, or blackened eyes, Plaintiff testified that they were not there before she went to detox, but admitted that she did not know how to account for them.  (<u>Id.</u> at 84-85.)  Jones acknowledged that neither Clark nor Baker hit her.  (<u>Id.</u> at 85.) The Eighth Circuit has held that "relatively minor scrapes and bruises" and "less-than-permanent aggravation of a prior [condition]" constitute *de minimis* injuries.  <u>Wertish v. Krueger</u>, 433 F.3d 1062, 1067 (8th Cir. 2006). Without minimizing Plaintiff's injuries to her wrists, leg, knees and face, they were not permanent or long-term injuries, nor injuries for which she even sought medical attention, but

were of a *de minimis* nature.

Although the Court does not diminish the pain and discomfort caused by the application

of the taser to Jones, this Court follows the reasoning set forth in <u>McClennon</u>.  There, this Court,

citing precedent from the Eighth Circuit, this Court and other courts, found that absent evidence

of long-term effects, the use of a taser did not inflict serious injury:

> But while a Taser delivers a "painful and frightening blow" that can render "even
> the most pain tolerant individuals utterly limp," <u>McKenney v. Harrison</u>, 635 F.3d
> 354, 362 (8th Cir. 2011), the Eighth Circuit has held that in the absence of
> evidence of long-term effects, the use of a Taser does "not inflict any serious
> injury." <u>Cook v. City of Bella Villa</u>, 582 F.3d 840, 851 (8th Cir. 2009); <u>accord,
> e.g.</u>, <u>Luepker v. Taylor</u>, No. 4:09CV1657, 2010 WL 2696701, at *9 (E.D. Mo.
> July 6,  2010) ("[T]he Court does not believe that the momentary pain and
> suffering caused by a [T]aser ... rises above the level of a *de minimis* injury.");
> <u>Chisolm v. VonDoran</u>, No. 4:08–cv–3242, 2010 WL 625381, at *6 (D. S.C. Feb.
> 19, 2010); <u>Bailey v. Cnty. of Kittson</u>, Civ. No. 07–1939, 2009 WL 294229, at *22
> (D. Minn. Feb. 5, 2009) (Montgomery, J., adopting Report & Recommendation of
> Erickson, M.J.) ("[W]e conclude that the Plaintiff's excessive force claim fails as
> a matter of law, because he has failed to demonstrate any actual injury—not even
> a *de minimis* injury—which resulted from use of the [T]aser gun."); <u>Stanley v.
> City of Baytown, Tex.</u>, No. Civ. A. H–04–2106, 2005 WL 2757370, at *6 (S.D.
> Tex. Oct. 25, 2005); <u>see also</u> <u>Schumacher v. Halverson</u>, 467 F. Supp.2d 939, 951
> (D. Minn.2006) (Rosenbaum, J.) (rejecting excessive-force claim predicated on
> use of Taser because, inter alia, it "did not cause any permanent physical injuries,
> and [plaintiff] did not require any medical or psychological treatment as a
> result"); <u>but see</u> <u>Orsak v. Metro. Airports Comm'n Airport Police Dept.</u>, 675 F.
> Supp.2d 944, 958 (D. Minn.2009) (Tunheim, J.) (noting that certain courts have
> held that "the effects of the [T]aser are more than *de minimis* ").  The fact that the
> officers used a Taser, therefore, cannot save the day for McClennon.

<u>McClennon</u>, __ F. Supp.2d at __, 2011 WL 5177393 at *5.

For all of these reasons, the Court finds that Plaintiff's injuries were of a *de minimis*

nature as a matter of law.  <u>See id.</u> at *6.  Even though it was clearly established as of February

15, 2009, that the Fourth Amendment guarantees the right to be free from excessive force during

a seizure of a person, the force used by Defendants did not cause more than *de minimis* injury.  It

was not clearly established, at the time, that an officer committed a constitutional violation under

these circumstances.  Therefore, Defendants are entitled to qualified immunity on Plaintiff's

excessive force claim.

**b.      Whether the Conduct Violated a Constitutional Right**

Although the Court's conclusion that the right at issue was not clearly established at the

time is dispositive of qualified immunity, given the developed record in this case, the Court also

concludes that Defendants did not violate Plaintiff's constitutional rights.   Without belaboring

the analysis, given the Court's conclusion above, the Court briefly addresses Plaintiff's claims of

excessive force, in terms of whether Defendants' conduct constituted a constitutional violation.

As the Eighth Circuit has observed, "We analyze excessive force claims in the context of

seizures under the Fourth Amendment, applying its reasonableness standard." Brown v. City of

Golden Valley, 574 F.3d 491, 496 (8th Cir. 2009).   This reasonableness standard recognizes that

government actors often face decisions that must be made instantly, in tense situations:

> With respect to a claim of excessive force, the same standard of reasonableness at
> the moment applies: "Not every push or shove, even if it may later seem
> unnecessary in the peace of a judge's chambers," Johnson v. Glick, 481 F.2d, at
> 1033, violates the Fourth Amendment. The calculus of reasonableness must
> embody allowance for the fact that police officers are often forced to make
> split-second judgments—in circumstances that are tense, uncertain, and rapidly
> evolving—about the amount of force that is necessary in a particular situation.

Graham, 490 U.S. at 396-97.

When considering an officer's use of force, a court considers the totality of the

circumstances and pays "careful attention to the facts and circumstances of [the] particular case,

including the severity of the crime at issue, whether the suspect poses an immediate threat to the

safety of the officers or others, and whether he is actively resisting arrest or attempting to evade

arrest by flight." Id. at 396.

In terms of the "severity of the crime at issue" in this case, while Jones was not under

arrest on February 15, 2009, she was essentially in temporary custody, en route to a treatment

facility due to her state of public intoxication.   Under Minnesota law:

> [a] peace or health officer or a person working under such officer's supervision,
> may take a person who is believed to be chemically dependent or is intoxicated in
> public into custody and transport the person to a treatment facility. If the person is
> intoxicated in public or is believed to be chemically dependent and is not in
> danger of causing self-harm or harm to any person or property, the peace or
> health officer may transport the person home.

Minn. Stat. § 253B.05, subd. 2.

The evidence at trial established that Deputy Johnson was the first law enforcement

officer in contact with Plaintiff on February 15, 2009.  He reported that she was stumbling down

the middle of the road, slurring her words, and yelling and swearing at him.  He determined that

she was very intoxicated and summoned Deputy Clark to transport Jones to the CRU.  (See

Johnson Supp'l Report at 1, Defs' Ex. 3.)   Plaintiff acknowledged that she was intoxicated that

evening and was also taking a high dose of Oxycontin, along with an anti-depressant.   Both she

and Deputy Clark testified that she was not wearing a coat and Jones conceded that she had no

viable means of getting from Byron, Minnesota to her home.  The DVD of Jones' transport to

the CRU depicts Jones, in an emotionally overwrought state, telling Deputy Clark that her

husband was abusive, had punched her earlier in the night, and that she wanted to kill herself.

Given that Jones was intoxicated in public and in danger of causing self-harm, under the plain

language of Minn. Stat. § 253B.05, subd. 2, law enforcement officers had the discretion to

assume temporary custody of Plaintiff to transport her to a treatment facility.   Deputy Johnson

determined that she should be transported to the CRU.   Under these circumstances, Jones was

lawfully transported to the CRU.   The fact of her temporary custody and transfer does not

support any independent claim for unreasonable seizure, to the extent that Jones makes such a

claim.

Underpinning Plaintiff's § 1983 claim are allegations of excessive force involving the taser, the positioning and handcuffing of Plaintiff on the squad car trunk, and the escort of Plaintiff into the CRU building.  The Court addresses these specific instances for which Plaintiff claims Defendants used excessive force, considering the nature and quality of the force used against Jones.

### a.    Tasing

"A threat to an officer's safety can justify the use of force in cases involving relatively minor crimes and suspects who are not actively resisting arrest or attempting to flee." Brown, 574 F.3d at 497.   In Brown, which involved a plaintiff-passenger in a traffic stop who "posed at most a minimal threat" to the officers, was not resisting arrest, nor attempting to flee, the Eighth Circuit was not convinced that the officer's tasing and arrest of the plaintiff was objectively reasonable as a matter of law.  Id. at 496.   The court therefore affirmed this Court's ruling denying summary judgment for the defendant officer, concluding that there was a genuine issue of material fact as to whether the officer used excessive force.   Id. at 498.

In contrast, however, where a person is physically resistant and non-compliant with a law enforcement officer, a number of courts, including this Court, have found that the use of a taser is objectively reasonable.  Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004) (affirming grant of summary judgment for defendant where use of a taser to effectuate plaintiff's arrest was reasonably proportionate to the difficult and tense circumstances facing defendant at a traffic stop, and did not constitute excessive force; plaintiff was hostile, uncooperative and refused to comply with defendant's request for documentation); Russo v. City of Cincinnati, 953 F.2d 1036, 1044-45 (6th Cir. 1992) (finding that district court erred in refusing to grant summary

judgment to defendant officer regarding claim that use of taser constituted excessive force;

although officer may have used excessive force during initial tasing, plaintiffs failed to show that

clearly established law rendered officer's actions unconstitutional in circumstances in which

officer confronted suspect who was armed, had made a number of threatening statements to

officers and was considered homicidal and suicidal and officer was attempting to avoid use of

lethal force); Davoe v. Rebant, No. 05-71863, 2006 WL 334297, *6 (E.D. Mich. Feb. 13, 2006)

(granting summary judgment in favor of defendants on excessive force claim in case in which

plaintiff was "hostile and uncooperative" immediately upon being approached by officers,

repeatedly ignored requests for identification, yelled at officers and refused order to enter patrol

car, at which point officers used taser); Imp, 2011 WL 4396941 at *5 (granting motion for

summary judgment in favor of defendants, finding that use of a taser on a non-cooperative,

intoxicated, resistant motorist was objectively reasonable under the Fourth Amendment).

    In addition, courts have found the use of a taser objectively reasonable where a person

poses a substantial risk of harm to themselves.  In McKenney v. Harrison, No. 8:09CV129, 2010

WL 560891, * 7-8 (D. Neb. Feb. 10, 2010), aff'd, 635 F.3d 354 (8th Cir. 2011), the defendant

officer, Pollreis, used a taser against Barnes, an unarmed person whom the authorities were

seeking in connection with outstanding warrants.  Barnes appeared to lunge at a closed second-

story window and, in order to prevent Barnes from going through the window and to prevent the

officer from being injured if she stood between Barnes and the window, Pollreis deployed the

taser.  Barnes fell through the closed window, and later died of injuries received from the fall.

Id. at *2-3.  The court found that the officer's split-second judgment to deploy the taser was

objectively reasonable under the circumstances she confronted and that a reasonable officer in

her position could have believed she was acting lawfully.  Id. at *8.  Accordingly, the court

found no Fourth Amendment excessive force violation and that the defendant officer was entitled

to qualified immunity. Id. Affirming the district court's ruling on appeal, the Eighth Circuit

reviewed the facts, finding that the use of force was reasonable:

> Despite the fatal consequences of the incident, the level of force employed also
> was not unreasonable. Pollreis used only a single Taser shock. She was required
> to react in a split second as Barnes sought to escape through a window only six to
> eight feet away. The alternative of attempting to subdue Barnes by tackling him
> posed a risk to the safety of the officer and did not ensure a successful arrest. The
> officers had warned Barnes. Just before he lunged, Harrison told Barnes not to do
> anything stupid, and Pollreis said "you don't want to be tased." And although the
> outcome was tragic, a reasonable officer, knowing that a Taser is designed to
> incapacitate instantly, could have believed that the force would incapacitate
> Barnes before he reached the window, while he was not in an "elevated position"
> and likely to fall. Under these circumstances, we conclude that the force used by
> Pollreis was reasonable.

McKenney, 635 F.3d at 360.

Similarly, in Imp, one factor underlying this Court's finding that the use of taser was

objectively reasonable was that the officers' encounter with the intoxicated driver occurred at

night, on the side of a busy two-lane highway, in which both the driver and the officers were at

risk of harm. Imp, 2011 WL 4396941 at *5.

Given the facts here, and giving Plaintiff the benefit of all reasonable inferences, Deputy

Clark's use of the taser on Jones was objectively reasonable as a matter of law. Balancing the

"nature and quality of the intrusion on an individual's Fourth Amendment interests against the

countervailing government interests at stake," Graham, 490 U.S. at 396, the use of the taser in

drive-stun mode permitted Deputy Clark and Deputy Baker to gain control of Plaintiff so that

she could exit the squad car and safely enter the CRU. Given Jones' escalating behavior during

the ride to the CRU, during which she begged not to be taken to the CRU, made a threatening

comment to Deputy Clark, offered sexual favors and ultimately threatened suicide, the need to

25

handcuff Plaintiff on arrival at the CRU was objectively reasonable.  Unlike Brown, in which the plaintiff was simply sitting in a squad car, refusing to end her cell phone call, 574 F.3d at 494-95, Jones actively resisted Deputy Baker's request, then command, that she step out of the squad car.  Not only was she physically resistive, Jones kicked Deputy Baker, making contact with his leg at least once.   She did not deny that her foot made contact with his body, although she testified that she did not intend to kick him. Whatever her intent, the record does not indicate that she made her intent known, and the deputies' conduct is assessed from the objective standpoint of a reasonable officer.  Moreover, Deputy Clark warned Jones of his intent to use the taser if she refused to cooperate with the deputies.  When Jones continued to actively resist, he applied the taser in drive-stun mode.[6]

After the taser was deployed, Plaintiff fell back into the squad car.  The officers were still unable to obtain control of Plaintiff.   While Plaintiff contends that she had no control over her body, the circumstances outlined above did not appreciably change – Plaintiff was not handcuffed, her limbs were moving about, she posed a risk to herself and to the deputies, and she was not compliant with their requests and commands.  The law requires the Court to consider the circumstances in totality, from the perspective of a reasonable police officer, faced with the need for quick decision-making.  While Plaintiff was not in custody for a violent  infraction, she continued to pose a significant danger to herself and to the officers.  The deputies testified that application of brute force to Plaintiff would likely have placed her at greater risk of injury.  In addition, Deputy Baker testified that use of chemical spray would possibly have resulted in inadvertent application to him and Deputy Clark.  Under these circumstances, where repeated

---

[6] While Clark and Baker contend that the taser was first applied to Plaintiff's leg and Plaintiff testified that it was applied to her chest or shoulder, this factual dispute is immaterial to the determination of reasonableness.

attempts to use lesser force were ineffective, the second application of the taser was objectively reasonable.  See Imp, 2011 WL 4396941 at *5 ("[T]he force required to strong-arm Imp's body into the squad vehicle against his will would have necessarily risked injury to Imp and the Deputies.  Use of the taser in drive-stun mode avoided use of brute physical force. . . .")

### b.        Positioning on Trunk

Defendants' actions in positioning Plaintiff on the back of the squad car in order to handcuff her do not rise to the level of a constitutional violation.   Jones testified that she was unconscious at this point, so she has no evidence to rebut Defendants' testimony.   The deputies testified that Jones was positioned on the back of the squad car for purposes of handcuffing. There is no evidence that excessive force was used in this process, other than Plaintiff's speculation about the source of her black eyes.  The officers testified that Jones' head was guided downward and her arm, close to her mouth, was moved in order prevent any possible risk of biting while she was handcuffed.  There is no evidence demonstrating that the deputies' actions were unnecessarily rough or excessive.  Given the totality of the circumstances, Defendants' actions in stabilizing Plaintiff against the vehicle were objectively reasonable.  Imp, 2011 WL 4396941 at *4 (taking Imp to the ground and later stabilizing against the vehicle were objectively reasonable, as Imp was intoxicated and verbally and physically resistant).

### c.        Escort into CRU Facility

Deputy Baker's actions in escorting Jones into the CRU do not rise to the level of a constitutional violation.  The deputies acknowledged that some lower portion of Plaintiff's legs might have dragged along the ground as she was escorted  for a distance of approximately forty feet.  Jones testified that she regained consciousness during this escort, recalled seeing the ground below her and that her knees were dragging on the ground.  Viewing any factual disputes

27

in Plaintiff's favor and therefore assuming that Plaintiff's knees were dragged along the ground, the Court finds that Defendant Baker's conduct was objectively reasonable.  Again, Jones was at the CRU site in order to be admitted to the facility.  The record reflects that Plaintiff is over six feet tall.  With two persons carrying her on either side, it is not unlikely that some portion of Plaintiff's lower extremities dragged on the ground.   Assuming, as Jones testified, that she was unconscious when the escort began, the deputies somehow needed to get Jones from the squad car into the building, presumably with no assistance from Jones herself.   A CRU staff member, not Deputy Clark, assisted Deputy Baker in escorting Jones into the CRU.

Again, balancing the nature and quality of the intrusion against the government interests, Graham, 490 U.S. at 396, carrying Plaintiff the relatively short distance into the CRU allowed her to be admitted.  According to her testimony, she was unconscious during some portion of the escort, so she was unable to walk into the facility under her own power.  Given Plaintiff's prior conduct and strong opposition to entering detox, Deputy Baker had an interest in getting Plaintiff treatment services as quickly as possible.  Faced with this type of situation, the decision to carry her, albeit with some part of her lower body dragging a short distance on the ground, was objectively reasonable.

### 2.    Due Process

To the extent that Plaintiff alleges a due process violation, as noted, Minn. Stat. § 253B.05 permits temporary custody in order to effect emergency admission to a treatment facility under precisely these circumstances.   The statute clearly gives law enforcement officers the discretion to determine whether to transport a person to a treatment facility, or to transport a person home.  To have left Plaintiff on her own in Byron, Minnesota would have placed her at risk of exposure from the elements.  Likewise, taking her home would have placed her in a

residence with a spouse whom she had accused of assault that very night.   Given her state of impairment and agitation, coupled with her threat of suicide, Deputy Clark reasonably followed through with Deputy Johnson's determination that Jones should be transported to the CRU. Plaintiff has presented no evidence showing that Defendants acted with deliberate indifference. Any due process claim she alleges cannot survive.   Moreover, because the Court cannot discern the violation of any clearly established right with respect to the decision to transport Jones to the CRU, Defendants are entitled to qualified immunity.  See Johnson v. Kramer, 04-CV-4097 (ADM/RLE), 2006 WL 334857, *6-7 (D. Minn. Feb. 13, 2006) (finding no due process violation where officers transported intoxicated person to his stated residence, absent any showing of deliberate indifference; moreover, officers were entitled to qualified immunity because they did not violate a clearly established right).

### B.    State Law Claim of Battery

"A battery is defined as an intentional unpermitted offensive contact with another." Johnson, 2006 WL 334857 at *3 (quoting Paradise v. City of Minneapolis, 297 N.W.2d 152, 155 (Minn. 1980)).  However, as noted herein, a law enforcement officer's right to make an arrest or investigatory stop inherently includes the right to use some amount of physical coercion in order to effectuate the stop or arrest.  Graham, 490 U.S. at 396.   Under Minnesota law, a law enforcement officer may use reasonable force in executing his or her duties imposed by law. Minn. Stat. § 609.06 subdiv. (1)(d).  Also under Minnesota law, the unreasonableness of the force used by an officer is an element of an action alleging assault and battery and the burden of proving such unreasonableness is on the plaintiff.  Brown v. City of Golden Valley, 534 F. Supp.2d 984, 995 (D. Minn. 2008) (citing Johnson v. Peterson, 358 N.W.2d 484, 485 (Minn. Ct. App. 1984)).   As discussed herein, the Court has determined that the deputies' use of force was

objectively reasonable.

Moreover, Defendants are entitled to official immunity for Plaintiff's state law battery claim. "Federal law [does not supplant] the Minnesota doctrine of official immunity in state law claims. . . . The common law of official immunity retains an independent vitality in state tort actions." Elwood v. Rice County, 423 N.W.2d 671, 677 (Minn. 1988).  In Minnesota, "[t]he official immunity doctrine provides that 'a public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong.'" Id. (quoting Susla v. State, 247 N.W.2d 907, 912 (Minn. 1976)).

In general, law enforcement officers are discretionary officials.  Johnson v. Morris, 453 N.W.2d 31, 42 (Minn. 1990).  "Only when officials act outside the scope of their charged authority can they be deemed to have waived this immunity and be held personally liable for their negligence." Dokman v. Cnty. of Hennepin, 637 N.W.2d 286, 296 (Minn. Ct. App. 2001), rev. denied (Minn. Feb. 28, 2002).

Here, Defendants were acting within the scope of their charged authority to transport and escort Plaintiff into the CRU.  Deputy Clark responded to a call from a fellow officer to transport Plaintiff, who was visibly intoxicated, to the CRU.  Based on Jones' behavior during the ride to the CRU, Deputy Clark requested assistance.  The DVD of the ride to the CRU clearly shows that Plaintiff was emotional, upset and desperate to avoid admission to the CRU.  She ultimately threatened self-harm.  Deputy Baker responded to Deputy Clark's request for assistance and attempted to obtain Jones' compliance with his requests that she exit the squad car.   When Plaintiff refused to comply with Deputy Baker's verbal request and verbal command, she then became physically resistant.  Jones kicked Deputy Baker and refused to let him handcuff her.

After warning Plaintiff that he would use a taser if she refused to comply, Deputy Clark deployed his taser two times.  The officers then handcuffed Plaintiff and she was escorted, via a carry hold, by Officer Baker and a CRU employee, into the CRU.  The evidence does not suggest that Deputy Clark acted outside the scope of his charged authority when he provided CRU transport to Plaintiff, who was visibly impaired due to intoxication, dressed without a coat on a winter night, without transportation and with self-reports of an abusive spouse at home. The evidence does not suggest that Defendants were acting outside the scope of their charged authority in their efforts to get Plaintiff out of the squad car, handcuffed, and into the detox center.

Only a showing of willful or malicious wrong prevents the application of official immunity.  In an official immunity context, "willful" and "malicious" are synonymous.  Brown, 574 F.3d at 500.  The Minnesota Supreme Court has defined malice as "nothing more than the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right."  Id. (quoting Rico v. State, 472 N.W.2d 100, 107 (Minn.1991)).  First, for the reasons previously set forth, Plaintiff has not shown that Defendants violated a "known right," because it was not clearly established that on February 15, 2009, that causing de minimis injuries violated the law.  See McClennon, __ F. Supp.2d at __, 2011 WL 5177393 at *8 (reaching the same conclusion, under the same reasoning, with respect to the plaintiff's state law negligence claim against law enforcement officers).

In addition, the evidence is clear that Deputy Clark transported Jones to the CRU in light of her state of impairment, her inability to care for herself, her risk of exposure to the elements, and because she reported living with an abusive spouse.   At the end of the ride, Jones threatened to kill herself.  Because her state of agitation increased during transport to the CRU, Deputy

Clark summoned assistance.  He purposely stepped aside upon arrival at the CRU site as a means of de-escalating the situation.  Deputy Baker asked, then commanded, Jones to step out of the squad car.  When she refused, Deputy Baker attempted to reach in and pull her out of the car. She actively resisted Deputy Baker's efforts and kicked him.

After warning Jones that he would use his taser if she refused to comply with Deputy Baker's command, Deputy Clark deployed his taser for five seconds.   When Plaintiff continued to resist, after an 18-second interval, Deputy Clark deployed the taser again for five seconds. The deputies positioned Plaintiff on the back trunk of the car in order to handcuff her.   They guided her head downward in a controlled manner in order to minimize any possible injury to themselves. Deputy Clark testified that he was concerned that Plaintiff might attempt to flee, given her constant pleas to avoid admission to detox, her suicidal state, and the fact that both deputies were armed with weapons that were within her reach.  The deputies were also concerned that Plaintiff might attempt to bite them during the handcuffing process.  Once Plaintiff was handcuffed, Deputy Baker and a CRU employee carried Jones for a distance of approximately 40 feet into the CRU.  While Jones contends that she was dragged in such a way that her knees scraped the ground, given her height and the need for her admission to detox, there is no evidence that Deputy Baker's efforts to escort her into the building were willful or malicious.

Plaintiff has failed to establish willful or malicious wrong on the part of Defendants. Bare allegations "without further support [are] not sufficient to create a fact issue on the issue of official immunity." Frank's Livestock v. City of Wells, 431 N.W.2d 574, 578 (Minn. Ct. App. 1988).   The Court finds no genuine issue of fact here – there is no evidence of a malicious or willful wrong.  Therefore, Defendants are entitled to official immunity for Plaintiff's state law

claim.

## III.     CONCLUSION

For the reasons stated herein, the Court finds that pursuant to Fed. R. Civ. P. 50(a)(1)(B),

Defendants' Motion for Judgment as a Matter of Law (found in Defs' Trial Brief [Doc. No. 44]

is granted.  Defendants are entitled to qualified immunity on Plaintiffs' federal civil rights claim

as well as official immunity on Plaintiff's state law claim, which also fails as a matter of law.  In

reaching this conclusion, the Court has resolved all direct factual conflicts in Plaintiff's favor,

assumed as true all facts supporting Plaintiff that the evidence tended to prove, and given

Plaintiff the benefit of all reasonable inferences.   Applying these standards, the Court finds that

the evidence, viewed in Plaintiff's favor, would not allow reasonable jurors to differ as to the

conclusions that could be drawn.  See Roberson, 602 F.3d at 933.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.     Defendants' Motion for Judgment as a Matter of Law (found in Defs' Trial Brief

[Doc. No. 44]) is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: February 7, 2012

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Judge